IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, a North Carolina Corporation,<br><br>           Plaintiff,<br><br>v.<br><br>FOSSLAND-OLSON INC., a Minnesota Corporation, and SCOTT FOSSLAND and TROY OLSON<br><br>           Defendants. | Civil Action No.:  0:14-cv-04734<br><br>**COMPLAINT FOR TRADEMARK INFRINGEMENT** |

## COMPLAINT

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, hereby complains of Defendant Fossland-Olson Inc. and Defendant Scott Fossland and Defendant Troy Olson, (hereinafter "Defendants"), and for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1.      This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to Slep-Tone's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

1

3. This Court has supplemental jurisdiction over the subject matter of Slep-Tone's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to Slep-Tone's federal claims that they form part of the same case or controversy.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Minnesota and the federal judicial district for the District of Minnesota.

5. This Court has personal jurisdiction over each Defendant, in that each of them resides in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6. Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7. Defendant Fossland-Olson Inc. is a Minnesota corporation having its principal place of business in Minneapolis, Minnesota. Defendant Fossland-Olson Inc. operates an eating and drinking establishment known as "1029 BAR" in Minneapolis, Minnesota. Defendant Fossland-Olson Inc. provides karaoke entertainment at the venue.

8. Based on information and belief, Defendant Fossland-Olson Inc. has common owners; Scott Fossland and Troy Olson are listed as owners and officers for Fossland-Olson Inc.

9. Defendant Scott Fossland is a resident of Minneapolis, Minnesota, and based on information and belief an owner and officer of Fossland-Olson Inc.

10. Defendant Troy Olson is a resident of Monticello, Minnesota, and based on information and belief an owner and officer of Fossland-Olson Inc.

## BACKGROUND FACTS

11. Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the trademark SOUND CHOICE.

12. Slep-Tone is recognized as a leading producer of high-quality karaoke accompaniment tracks and has invested more than $18 million to re-record and replicate the authentic sound of approximately 18,000 popular songs across different eras and genres of music.

13. Slep-Tone's dedication to producing music of the highest quality and the most authentic character led to its SOUND CHOICE label being the most recognizable and sought-after in the industry.

14. Throughout its history, Slep-Tone has released its products for commercial use exclusively on physical media—initially, cassette tapes, and then compact discs beginning in approximately 1994.

15. Originally, Slep-Tone's compact discs contained karaoke tracks encoded in a special format known as "CD+G," or "compact disc [audio] plus graphics," that allows for synchronized playback of audio and video suitable for prompting singers with lyrics cues.

16. CD+G discs required special players that were capable of decoding the CD+G format.

17. More recently, computer technology that allows the karaoke tracks stored on compact discs in CD+G format to be decoded and "ripped" (copied) to a computer hard drive has become widely available.

18. Copies of karaoke tracks stored on media other than the original compact discs are referred to as "media-shifted copies" because they have been duplicated from the original media and written to non-original media.

19. Media-shifting also frequently involves format-shifting, the conversion from the original format (such as CD+G) to another format (such as MP3+G or WAV+G).

20. As the price of computer hard drives of ever-larger size has fallen, professional users now have the technical ability to store a large number of karaoke accompaniment tracks on hard drives for convenient transport to their karaoke shows, without also carrying large numbers of compact discs.

21. As a result, most professional karaoke operators have shifted to the use of ripped karaoke tracks stored on computer media such as hard drives as a matter of convenience.

22. However, the same technology is capable of being used not only for convenience but also to allow—on a technical level—the operator to use more music than he or she has paid for and, in some cases, to avoid paying for music at all.

23. Karaoke operators have used the available technology to copy one purchased disc to two or more computer systems for simultaneous use; to copy their patrons' discs to the operator's computer hard drive at a show; to "swap" song files with other operators; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with copies of karaoke tracks; and to sell off their original media in the secondary market once they have ripped those media to a hard drive.

24. The foregoing activities nearly drove Slep-Tone out of business because it became relatively easy to obtain free, or at a nominal cost, illicit copies of products that would cost tens of thousands of dollars if purchased at retail.

4

25. Historically, Slep-Tone opposed the shifting of SOUND CHOICE karaoke tracks to alternative media, warning purchasers of CD+G discs that unauthorized copying was a violation of applicable laws.

26. More recently, however, Slep-Tone established a media-shifting policy ("MSP") that imposes mandatory rules for karaoke operators who use media-shifted copies of SOUND CHOICE karaoke tracks to provide commercial karaoke services.

27. Briefly stated, the MSP requires compliance with four conditions: (1) 1:1 ("one-to-one") correspondence, meaning that for every media-shifted SOUND CHOICE karaoke track on a given medium such as a computer hard drive, the operator owns and maintains possession of a lawful original SOUND CHOICE karaoke track on its original medium, on a one-copy-for-one-original basis; (2) that the original media that form the basis for 1:1 correspondence are placed "on the shelf," i.e., not used for any purpose at all; (3) that the operator notify Slep-Tone that he or she has media-shifted karaoke tracks; and (4) that the operator submit to and be certified as having passed an audit of the operator's systems to verify complete compliance with the MSP.

28. The basis of Slep-Tone's authority to require compliance with the MSP is its right to control the commercial use of its federally registered trademarks and, as to some tracks, its ownership of copyright in the synchronized audiovisual words represented by and in the sound recordings associated with those tracks.

29. If an operator complies with all four conditions of the MSP, then that operator is granted permission from Slep-Tone, co-extensive only with Slep-Tone's rights in the subject matter, to use the media-shifted copies to provide commercial karaoke services.

30. If an operator fails to comply with any of the conditions of the MSP, then none of the media-shifting the operator has conducted is permitted, authorized, or tolerated by Slep-Tone.

31. Slep-Tone and its affiliate companies pay statutory and negotiated royalties to the owners of copyright in the underlying musical works for their activities in legitimately creating, copying, distributing, and selling compact discs containing karaoke accompaniment tracks.

32. Slep-Tone and its affiliated companies have spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits, and building a brand that is one of the pre-eminent brands in the industry.

33. The widespread creation, distribution, and commercial use of counterfeit copies of Slep-Tone's karaoke discs, including by these Defendants, has denied Slep-Tone the benefit of its investments.

34. These counterfeits include Slep-Tone's registered trademarks, such that to the consumers of the illegitimate KJs' services, the counterfeits are virtually indistinguishable from genuine SOUND CHOICE® materials.

35. For each of the several recent releases of new karaoke music by Slep-Tone, dozens of illegitimate copies of the contents of the disc have been created, on average, for each legitimate copy sold. Slep-Tone, its affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

36. Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

37. Widespread pirating of songs has contributed to the loss of more than eighty jobs at the Plaintiff's location in Pineville, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

38. Legitimate KJs spend thousands of dollars acquiring Slep-Tone's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

39. Illegitimate KJs, including these Defendants, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of Slep-Tone's tracks.

40. In order to build a large library of Slep-Tone's accompaniment tracks, a legitimate KJ could expect to spend approximately $25,000 for each karaoke system upon which that library would be used. For a comprehensive library of Slep-Tone's accompaniment tracks, that figure would rise to $40,000 or more.

## THE RIGHTS OF THE PLAINTIFF

41. Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

42. Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

43. Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

44. Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

45. Slep-Tone has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

46. Principally, the Sound Choice Marks are indicators of Slep-Tone as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Slep-Tone or at its direction and under its control.

47. Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress"). This distinctive and protectable trade dress includes, at a minimum, (1) the use of a particular typeface, style, and visual arrangement in displaying the

lyrics; (2) the Sound Choice Marks; and (3) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

48.  Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

49.  The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

50.  The aforementioned trade dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

51.  The elements of the Trade Dress represent specific design choices by the Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

52.  No competitor of Slep-Tone is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Slep-Tone's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF THE DEFENDANTS

53.  Defendants provide karaoke entertainment at their venue: 1029 BAR in Minneapolis, Minnesota.

54. On information and belief, Defendants provide karaoke shows at least Wednesday through Sunday at the aforesaid venue.

55. On information and belief, the venue owns karaoke equipment, i.e., lap tops, external hard drives, speakers, microphone, etc., to provide karaoke entertainment.

56. On information and belief, Defendants employ several individuals to facilitate the karaoke shows.

57. On information and belief, in order to provide services, rather than using original karaoke discs that it possesses (if it indeed possesses such discs), Defendants rely upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

58. On information and belief, Defendants rely upon at least one such computer hard drive described in paragraph 55 herein.

59. On information and belief, Defendants create, or direct another to create, or otherwise acquired from a third party the files that are stored on its computer hard drive(s).

60. On information and belief, Defendants did not pay royalties or fees to Slep-Tone or to upstream owners of copyright in the underlying musical works for the privilege of conducting their duplicative activities.

61. Defendants did not pay any royalties or fees to Slep-Tone for the privilege of displaying the Sound Choice Marks during the karaoke shows.

62. On information and belief, Defendants do not maintain a 1:1 correspondence relationship between its hard drives and original discs it has lawfully acquired.

63. Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on the Defendants' computer hard drives at the time those files were so stored.

64. Rather, on information and belief, the files were created by or at the behest of the Defendants, or by a third party unknown to Slep-Tone. The party who created the files is the "origin" of the files for purposes of the Trademark Act.

65. On information and belief, many of the files stored on the Defendants' computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the Sound Choice Marks.

66. When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

67. Slep-Tone did not authorize the Defendants to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

68. As such, the placement of the Sound Choice Marks and the Trade Dress upon the Defendants' self-created computer files is a false designation of the origin of those computer files.

69. At all times relevant to the causes of action stated herein, the Defendants have known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

70. Defendants' files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

71. A patron or unwitting customer of the Defendants, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of the Defendants' shows, is

likely to be confused into believing, falsely, that Slep-Tone created the tracks in use or authorized their creation.

72. On information and belief, Defendants' activities are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, in some cases months.

73. Defendants' use of the computer files representative of karaoke accompaniment tracks is commercial in nature because they are paid to provide access to and play those computer files and tracks at karaoke shows.

74. Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Defendants are compensated and which inures to its benefit.

75. Defendants' piracy of accompaniment tracks is not limited to Slep-Tone's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

## DAMAGES

76. Defendants' unauthorized use of the Slep-Tone's trademarks has damaged Slep-Tone.

77. Defendants damaged Slep-Tone in an amount to be proven at trial but not less than $25,000 for each karaoke system they own or operate and which contains karaoke tracks that infringe the Sound Choice Marks as detailed above, based upon their foregone purchases of original media.

78. Defendants have also enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

79. Defendants' illicit activities have also allowed it to compete unfairly against Slep-Tone's legitimate customers by lowering its cost of doing business through piracy of the music materials it uses.

80. Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which the Defendants operate by helping to crowd higher-cost but legitimate operators out of the market.

81. Defendants' acts deprived Slep-Tone of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

## FIRST CLAIM FOR RELIEF
## TRADEMARK AND TRADE DRESS INFRINGEMENT
### (Against All Defendants)

82. Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-81 of this Complaint.

83. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

84. Use of the Sound Choice Marks and the Trade Dress by Defendants were "in commerce" within the meaning of the Trademark Act of 1946 as amended.

85. Slep-Tone did not license Defendants to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of their services.

86. Use of the Sound Choice Marks and the Trade Dress by Defendants in this manner is likely to cause confusion, or to cause mistake, or to deceive their customers and patrons into believing that their services are being provided with the authorization of Slep-Tone and that their music libraries contain bona fide Sound Choice accompaniment tracks.

87. On information and belief, the acts of Defendants were willful, knowing, and intentional.

88. Slep-Tone has been damaged by these infringing activities.

89. Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### (Against All Defendants)

90. Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-81 of this Complaint.

91. On each occasion Defendants caused or permitted an unauthorized counterfeit duplicate of a Slep-Tone accompaniment track to be played during a karaoke show at a given establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with the Defendants' karaoke services.

92. The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone manufactured the karaoke

14

accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendants' services and commercial activities.

93. The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased or otherwise licensed by Defendants.

94. Defendants' use of Slep-Tone's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of Slep-Tone if Defendants had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

95. Because Slep-Tone has been denied this revenue, it has been damaged by Defendants' uses.

96. On each occasion when Defendants caused or permitted an accompaniment track pirated from a manufacturer other than Slep-Tone to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the Defendants' karaoke services.

97. Upon information and belief, Defendants' use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact Defendants or an upstream but unauthorized provider of the track was the origin of that track.

98. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Defendants acquired in a legitimate manner.

99. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Defendants.

100. Defendants' use of the false designations of origin in this fashion damages Slep-Tone by enabling Defendants to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers, can provide or obtain them.

101. The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

102. Because Slep-Tone has been denied this revenue, it has been damaged by Defendants' false designations of origin relating to other manufacturers.

103. Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## THIRD CLAIM FOR RELIEF
### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
(Against All Defendants)

104. Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-81 of this Complaint.

105. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by

displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

106. Defendants' acts of infringement occurred during the conduct of trade or commerce, from which Defendants derived an economic benefit.

107. Defendants' acts of infringement constitute unfair or deceptive acts or practices within the meaning of Minn. Stat. § 325D.43 et seq.

108. Defendants' acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Slep-Tone.

109. As a direct and proximate result of the Defendants' acts of infringement Slep-Tone has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Defendants' acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.

110. As such, Slep-Tone has been damaged and is likely to be further damaged by a deceptive trade practice of Defendants within the meaning of Minn. Stat. § 325D.44.

111. Unless enjoined by the Court, Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

### FOURTH CLAIM FOR RELIEF
### COMMON LAW UNFAIR COMPETITION
### (Against All Defendants)

112. Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-81 of this Complaint.

113. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the

17

provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

114.    Defendants' use of the Sound Choice Marks and the Trade Dress was "in commerce" within the meaning ascribed by Minnesota common law.

115.    Slep-Tone did not license Defendants to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Trade Dress in connection with the services provided at its night club.

116.    Use of the Sound Choice Marks and the Trade Dress in the manner attributable to the Defendants is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which the Defendants performs into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

117.    Defendants' acts were willful and knowing.

118.    Slep-Tone has been damaged by infringing activities of Defendants.

119.    Unless enjoined by the Court, Defendants' infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Slep-Tone prays for judgment against each of the Defendants, and that the Court:

A.    Find that Defendants committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B. Find that Defendants engaged in unfair competition detrimental to Slep-Tone in violation of 15 U.S.C. § 1125(a);

C. Enter judgment against Defendants and in favor of Slep-Tone on all applicable counts;

D. Find the Defendants' activities were in all respects conducted willfully and for profit;

E. Award to Slep-Tone Defendants' profits and the damages sustained by Slep-Tone because of Defendants' conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed, per Defendant and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendants, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

F. Award to Slep-Tone Defendants' profits and the damages sustained by Slep-Tone because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $25,000 for each karaoke system operated by Defendants, and not less than $50,000 for each establishment in which the infringement occurred;

G. Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for Defendants' acts of willful infringement;

H. Order all computer disks, drives, or other media belonging to Defendants, which media contain counterfeits of Slep-Tone's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

    I.    Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Defendants;

    J.    Grant Slep-Tone preliminary and permanent injunctive relief against further false designations of origin by Defendants with respect to words, names, and symbols associated with other manufacturers;

    K.    Award Slep-Tone its costs suit and attorney fees, to the extent not awarded above; and

    L.    Grant Slep-Tone such other and further relief as justice may require.

**Respectfully submitted,**

Dated: November 12, 2014    By:    /s/Jessica M. Alm
David R. Fairbairn (No. 28,125)
Jessica M. Alm (No. 395,245)
KINNEY & LANGE, P.A.
The Kinney & Lange Building
312 South Third Street
Minneapolis, MN  55415-1002
Email:    drfairbairn@kinney.com
           jalm@kinney.com
Telephone:  (612) 339-1863
Facsimile:   (612) 339-6580

**ATTORNEYS FOR PLAINTIFF**
**SLEP-TONE ENTERTAINMENT**
**CORPORATION**